UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IVAN CUEVAS,

            Plaintiff,

      v.

CITY OF AURORA and OFFICER DAVID
BRIAN,

            Defendants.

No. 22 CV 3893

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Defendant Aurora Police Department Officer David Brian arrested plaintiff Ivan Cuevas for resisting a peace officer. Cuevas sues Officer Brian for false arrest, excessive force, and malicious prosecution. He sues the City of Aurora as liable for its agent's actions, and for indemnification. Defendants move for summary judgment. For the reasons discussed below, the motion for summary judgment is denied.

## I.    Legal Standard

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I view the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023).

## II. Background

In July 2020, plaintiff Ivan Cuevas lived at an apartment in Aurora, Illinois. [57] ¶ 1; [59] ¶ 1.[1] He was 5'10" tall and weighed 170 pounds. [59] ¶ 4. His apartment was one of four apartments on the second floor of the building, and the first floor was a storefront. [57] ¶ 2; [59] ¶ 1. Cuevas and his then-girlfriend Maria Saltijeral owned the business that occupied the first-floor storefront. [57] ¶ 3. At the front of the building there were three doors: one leading to the second-floor apartments, one that opened directly into Cuevas's shop, and a third leading to another ground-floor business. [57] ¶ 4. There was a bar next door to the business that received frequent calls for disturbances. [57] ¶ 5. The four-block area around the apartment and bar was known as a "high-call volume area" and "known for a lot of activity" to defendant Aurora Police Department Officer David Brian. [57] ¶ 7; [49-2] at 39 (39:2–22).

At around 10:00 p.m. on July 30, Saltijeral asked Cuevas to go downstairs to check on their store, because she heard a noise. [57] ¶ 40; [59] ¶ 1. Cuevas got his dog and headed downstairs to both let the dog out in the backyard behind the store and

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. When citing depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [57] and [59], where both the asserted fact and the opposing party's response are set forth in one document. Asserted facts need to be supported by reference to specific pages in the evidentiary record. N.D. Ill. Local R. 56.1(d)(1)–(2). Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see also* [59] ¶ 39. The parties dispute many facts, but the facts in those disputes are not all material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include both sides' versions.

2

to figure out what the noise was. [57] ¶ 40; [59] ¶ 6. He was walking slowly, holding a beer and cigarettes in his hands, with his dog in between his legs because his dog did not have a leash on. [57] ¶ 40; [59] ¶ 7. Cuevas did not see anything unusual and it was peaceful outside. [57] ¶ 41; [59] ¶ 7. He unlocked the door to the store, let the dog in, stepped in, and locked the door behind him. [57] ¶¶ 43–44; [59] ¶ 7.

Around the same time, an anonymous 911 call was made by a person at the bar next to Cuevas's building who said they were being threatened by a person with a gun. [57] ¶¶ 12–14; [59] ¶ 2. The description of the person with the gun was that they were 5'6" tall and 120 pounds. [57] ¶ 14; [59] ¶ 3. There was no description of the person's age, race, or gender. [59] ¶ 14; [59] ¶ 3. Officer Brian, who was less than a block away, responded to the call. [57] ¶¶ 15–16; [59] ¶¶ 2, 5. He was the first officer on the scene. [57] ¶ 16.

When Brian pulled up, he said he saw two people outside. [59] ¶ 9; [49-2] at 52–53 (52:19–53:6); [54-1] at 55 (54:3–5). In Brian's version of events, when the men saw the police, they "panicked and took off." [49-2] at 53–54 (53:13–14, 54:15–16). One of the men, Cuevas, went into the shop on the ground floor. [57] ¶ 18. Brian said Cuevas did not run but went into his business "very quickly." [54-1] at 60 (59:5–11). Brian thought the building might be abandoned, but Saltijeral said the store was open and functioning in June of 2020. [49-2] at 110–11 (110:20–111:6); [49-3] at 5 (17:24–18:1). There were no lights on in the store. [57] ¶ 26. Brian said he shined his light on Cuevas and told him he was with the Aurora Police Department and he

wanted to talk, but that Cuevas kept going. [49-2] at 58 (58:3–20). Brian did not see Cuevas holding a gun. [59] ¶ 10.

Cuevas denied that he was with another person and said he did not see anyone else outside when he exited the building from the door leading to the second-floor apartments. [54-1] at 143 (142:19–21), 154 (153:8–15). Cuevas said he never saw the police before entering the store and could not move quickly because he had his dog in between his legs. [49-1] at 22–24 (85:6–16, 92:21–93:2); [54-1] at 143–44 (142:11–13, 142:19–143:7), 155–56 (154:17–155:14).

Once Cuevas was in the store, he walked to the back where he let his dog out to the backyard. [59] ¶ 8. Brian did not see Cuevas throw or hide anything in the back of the store. [59] ¶ 11. Brian banged on the window of the store and ordered Cuevas to come out. [59] ¶ 13. Officers Stone, Spooner, and Contreras responded to the scene after Brian. [59] ¶ 16; [49-4] at 11 (39:22–24). Contreras said he saw Brian at the front door of the store yelling for Cuevas to come to the front of the store at least five times. [57] ¶¶ 24, 26.[2]

Cuevas heard the yelling and banging and saw a flashing light, but did not hear what was being said. [57] ¶ 44; [59] ¶ 12. Cuevas and Contreras testified that Cuevas walked to the front of the store as ordered and stood by the glass door. [57] ¶ 45; [59] ¶ 14; [54-1] at 147 (146:5–19); [49-4] at 15 (55:4–6). Brian claimed that Cuevas hid behind a back wall, peeking out, before walking to the front. [49-2] at 59

---

[2] Cuevas denies this fact, but his record citation does not contradict that Contreras testified as such.

(59:8–10). Cuevas denied that he hid behind the back wall, and said he immediately walked to the front. [54-1] at 146 (145:7–16). It took plaintiff somewhere between seconds and two minutes to walk from the back of the store to the front door. [59] ¶ 19.[3] Cuevas did not verbally respond. [49-4] at 13 (48:4–9).

When Cuevas got to the front door, he told Brian through the door that he was the owner of the business. [57] ¶ 46; [54-1] at 29 (28:17–21). Cuevas asked what he had done and Brian did not answer, instead telling Cuevas to follow his commands. [59] ¶ 22. As they were talking, Brian drew his service weapon. [59] ¶ 24. Cuevas said that Brian pointed his gun at him, and he froze. [54-1] at 147–48 (146:22–147:2); [57] ¶ 47.[4] Brian refused to talk to Cuevas while he was inside the store. [59] ¶ 23. Brian told Cuevas that he would kick the front door in if Cuevas did not come out. [59] ¶ 25.

Cuevas unlocked the door, and the officers pushed the door in, grabbing Cuevas and pulling him out. [57] ¶¶ 30, 48; [59] ¶ 26. Cuevas and the officers fell face forward to the ground. [59] ¶ 29. Contreras testified that he performed a leg sweep on Cuevas, but Stone testified that it was possible that "everybody sort of fell to the ground." [54-1] at 127 (126:18–23). Contreras testified that Cuevas put his hands out in a push-up

---

[3] Contreras testified that Cuevas walked to the front of the store, made sure the door was locked, and then returned to the back of the store. [49-4] at 15 (54:16–19). Brian never testified that Cuevas went back after coming forward, and instead, testified that he kept ordering Cuevas to open the door, as Cuevas stood there, and eventually Cuevas did. [54-1] at 69 (68:8–21), 70–72 (69:18–70:18, 70:23–71:16), 73 (72:12–22), 147–48 (146:5–147:5), 160 (159:1–21).

[4] Contreras testified that after Cuevas walked to the back of the store, he put his hands in his pockets, and that is when Brian pulled his gun out. [49-4] at 17 (63:6–22). This is not reflected in the testimony of any other person, including Brian himself. *See* [54-1] at 147–48 (146:22–147:2); 32–33 (31:21–32:1).

position, but also said Cuevas "could have" put his arms in front of him to brace himself as they fell. [59] ¶ 34; [49-4] at 19 (73:11–14).[5] Brian held Cuevas's head to the ground as the other officers handcuffed him. [57] ¶ 34; [59] ¶¶ 29–30. Cuevas tensed his arms, but never kicked, punched, hit, scratched, or tried to get up and run. [57] ¶ 32; [59] ¶¶ 31, 33. Cuevas never resisted; if he tensed up, it was because he was scared. [54-1] at 151 (150:4–8); [49-1] at 26 (101:2–102:9). He said, though, that he felt more like a "rag doll." [54-1] at 153 (152:5–11). Brian testified that Cuevas resisted by "fighting and put[ting] his hands everywhere." [49-2] at 116 (116:2–3). Contreras also testified that Cuevas was not following the officers' commands to stop resisting and put his hands behind his back. [49-4] at 19 (70:8–12).

None of the officers asked Cuevas's name or whether the space was his business before grabbing him. [59] ¶ 27. Brian did not remember asking Cuevas about a gun and thought he probably did not ask. [59] ¶ 35. Contreras did not recall that either he or Brian explained to Cuevas why they were there. [59] ¶ 28. Brian never recovered a gun from Cuevas or the area. [59] ¶¶ 10, 35.

Brian charged Cuevas with one count of resisting a peace officer. [57] ¶ 50; [59] ¶ 37. At trial, an Illinois state court judge granted Cuevas's motion for a directed verdict and found him not guilty of resisting a peace officer. [57] ¶ 53; [59] ¶ 40.

---

[5] Contreras also testified later that he did not recall if Cuevas put his hands out while falling. [49-4] at 20 (74:14–24).

### III.    Analysis

### A.    False Arrest

#### 1.    Merits

Probable cause is "an absolute defense to any § 1983 claim against a police officer for false arrest." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 713–14 (7th Cir. 2013). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id*. at 714; *accord Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015).

Defendants argue that Brian had probable cause to arrest Cuevas—though initially they do not explain what crime Brian had probable cause to arrest Cuevas for. In their reply, defendants clarify that Brian had reasonable suspicion to stop Cuevas, and that when Cuevas resisted a lawful investigative stop, Brian had probable cause to arrest him for resisting the stop.

The Illinois resisting arrest statute criminalizes knowingly resisting or "obstruct[ing] the performance by one known to the person to be a peace officer … of any authorized act within his or her official capacity." 720 ILCS 5/31-1. A conviction for this offense requires the defendant know both that (1) the person being resisted or obstructed was a peace officer, and (2) that his actions would resist or obstruct the officer's authorized act. *People v. Borders*, 2020 IL App (2d) 180324, ¶ 33.

If an officer's act violated the Fourth Amendment, it was not authorized. *People v. Gallagher*, 2020 IL App (1st) 150354, ¶ 29. An investigative stop pursuant to

7

reasonable, articulable suspicion does not violate the Fourth Amendment and is authorized. *Id.* at ¶ 32; *People v. Johnson*, 285 Ill.App.3d 307, 309 (1996). If Brian was authorized to stop Cuevas, Cuevas could not lawfully resist the stop, and if he did so, Brian had probable cause to arrest him for violating the statute.

To justify an investigative stop, officers must point to "specific and articulable facts that, combined with the rational inferences from those facts, make the intrusion reasonable." *Gallagher*, 2020 IL App (1st) 150354, at ¶ 33. This means that the officer must have "observed unusual conduct, leading to a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Id.* at ¶ 34. Taking the facts in Cuevas's favor, Brian did not have reasonable suspicion to stop Cuevas.

Brian received information that a person who was 5'6" tall and 120 pounds was threatening someone with a gun in a high crime area. Brian saw Cuevas—who was 5'10" tall and 170 pounds—enter a store after unlocking the door. He had his dog between his legs, and a beer and cigarettes in his hand. When Brian banged on the door for Cuevas to come up to the front of the store, Cuevas complied. Cuevas told Brian through the door that he owned the business, and that he wanted to speak through the door. Brian told Cuevas he would not speak to him through the door, pointed his gun at Cuevas, and told Cuevas to open the door or he would kick it down. Cuevas complied, and as soon as he did, Brian and other officers who had arrived pushed open the door and yanked Cuevas out, causing him to fall to the ground.

A person's "mere presence in [a] high-crime area, standing alone," is not sufficient to give officers reasonable suspicion that he was engaged in criminal

activity. *Gallagher*, 2020 IL App (1st) 150354, at ¶ 40. But that is the only factor, accepting the facts according to Cuevas, that could give rise to reasonable suspicion here. Brian saw Cuevas enter the store with a dog and a beer in his hand—not a gun. Cuevas did not fit the bare-bones description from the 911 call, which described a person four inches shorter and fifty pounds lighter than Cuevas, and gave no details of the gender, race, or clothing of the person. "The description … was so general and lacking in distinctiveness as to furnish no more basis for the arrest of the defendant than of many other persons who might be" out on the street that night. *People v. Gabbard*, 78 Ill.2d 88, 93 (1979). Cuevas complied with all of Brian's orders. There were no specific, articulable facts that Cuevas had committed or was about to commit any crime when he was stopped by Brian. Brian lacked even reasonable suspicion to stop Cuevas, and so he was not engaged in an authorized act. Because Brian did not have probable cause that Cuevas resisted arrest, Cuevas's claim for false arrest is not barred.

### 2.    *Qualified Immunity*

Defendants argue that even if there were no probable cause, Brian is entitled to qualified immunity. Government actors performing discretionary functions are immune from any suit for damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Abbott*, 705 F.3d at 713 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court asks whether the defendant violated a plaintiff's constitutional right, and whether the defendant should have known that he was violating plaintiff's

constitutional rights when he acted (although a court can decide which question to answer first). *Id.*; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Cuevas "bears the burden of defeating [qualified immunity] either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24 (internal citation omitted). For a right to be "clearly established," "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To determine whether a right is clearly established, a court should look to "controlling precedent from both the Supreme Court and this circuit, and if there is no such precedent we cast a wider net and examine all relevant case law to determine whether there was such a clear trend in the case law that we can say with a fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731.

A police officer is entitled to qualified immunity on a false-arrest claim when, even if there is no probable cause, "a reasonable officer could have mistakenly believed that probable cause existed." *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024) (internal quotations omitted). This "arguable probable cause" is established when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably

believed that probable cause existed in the light of well-established law." *Id.* at 656 (internal quotations omitted).

Taking the facts in Cuevas's favor, Brian did not have reasonable suspicion to stop Cuevas. Although Cuevas was in a high crime area, it was clearly established that mere presence "does not even support reasonable articulable suspicion," much less arguable probable cause. *Huff v. Reichert*, 744 F.3d 999, 1007–08 (7th Cir. 2014). There were no specific facts indicating that Cuevas was the person with the gun, and there were facts indicating he was not, and so Brian was not authorized to stop him. *See, e.g.*, *Mwangangi v. Nielsen*, 48 F.4th 816, 828 (7th Cir. 2022) (911 call without information about underlying conduct not enough to support that there was arguable probable cause). Without reasonable suspicion for the stop, no reasonable officer could have believed there was probable cause to arrest Cuevas.

And there is no arguable probable cause if a reasonable officer could not have believed that Cuevas "had undertaken (or was about to undertake) a physical act which imposed an obstacle that impeded, hindered, interrupted, prevented, or delayed" Brian's performance of his authorized acts. *Abbott*, 705 F.3d at 721–22. Cuevas had complied with all of Brian's commands, opened the door, and was grabbed, thrown to the ground, and arrested. Cuevas never resisted and felt like a "rag doll." [54-1] at 153 (152:5–11). If the disputed facts were resolved in Cuevas's favor, no reasonable officer could have believed Cuevas was resisting arrest. Qualified immunity does not apply at this time. *Gonzalez v. City of Elgin*, 578 F.3d 526, 540

(7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.").

## B. Excessive Force

### 1. Merits

The Fourth Amendment "guarantees citizens the right to be secure in their persons … against unreasonable ... seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). To determine what constitutes a "reasonable seizure" a court must examine the totality of the circumstances "from the perspective of a reasonable officer on the scene" paying "careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This is an objective analysis, where the court must "balanc[e] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* An officer's subjective beliefs and motivations are irrelevant. *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). A reviewing court can look at each discrete use of force to see if it is justified by the circumstances. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018).

An officer may use no more than minimal force on a suspect who is only passively resisting arrest. *See Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) ("Unlike when someone is passively refusing to move or follow lawful commands, the police may use significant force to subdue someone who is actively resisting lawful detention."); *Abbott*, 705 F.3d at 732 ("[O]nly a minimal amount of

force may be used on [passively resisting suspects].”); *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021) (“[C]ontinuing to apply unnecessary force against a civilian once he is already subdued may be an unreasonable use of force.”); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (suspect demonstrated only “passive resistance” when he was lying with his arms outstretched and obeying every order except for the order to put his hands behind his back). The “prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon.” *Miller*, 761 F.3d at 829.

Whether Cuevas resisted arrest is disputed by the record evidence, so summary judgment is inappropriate on the excessive force claim. Taking the facts in the light most favorable to Cuevas, he was compliant with Brian's orders and was not resisting when he was grabbed by Brian, causing him to fall to the ground, and then had his head held to the ground. Although defendants argue that Cuevas fell because of Contreras's leg sweep, other evidence shows it was the force of him being pulled from the store that caused him to fall. Depending on how it resolved the factual disputes, a jury could find that Brian used excessive force. Summary judgment on Cuevas's excessive force claim is denied.

### 2. *Qualified Immunity*

Qualified immunity is likewise inappropriate because the disputed facts directly implicate whether Brian knew that pulling Cuevas hard enough to cause him to fall and holding his head against the ground violated Cuevas's constitutional right

13

not to be subjected to force when Cuevas was compliant. It was clearly established that taking someone to the floor who was not resisting or who was passively resisting is excessive. *Abbott*, 705 F.3d at 732; *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (it is "clear" that officers do not have the right to "shove, push, or otherwise assault innocent citizens without any provocation whatsoever"); *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (grabbing plaintiff, twisting his arm, shoving, and taking him to the floor unreasonable where plaintiff was "docile and cooperative"); *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008) (even where plaintiff was not fully cooperative, tackling plaintiff was unreasonable).

The factual disputes make it impossible to determine whether Brian's actions violated Cuevas's "clearly established" constitutional rights. *Gonzalez*, 578 F.3d at 540. There are factual disputes about Brian's actions and his level of involvement, so it is premature to resolve the issue of qualified immunity.

### C. Malicious Prosecution

Defendants' sole argument for summary judgment on Cuevas's malicious prosecution claim is that because Brian had probable cause to arrest Cuevas, the claim must be dismissed. As discussed, taking the facts in Cuevas's favor, Brian did not have probable cause to arrest Cuevas. Cuevas's malicious prosecution claim survives.

### D. Indemnification

Because disputed issues of material fact prohibit the resolution of Cuevas's claims against Officer Brian, the indemnification claim against the City of Aurora remains pending. *See* 745 ILCS 10/9-102.

14

## IV.     Conclusion

Defendants' motion for summary judgment, [48], is denied.


ENTER:

Manish S. Shah
United States District Judge

Date: July 9, 2025